FILED
11/16/2020
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 4, 2020

**ELVIS LOUIS MARSH v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Marshall County
No. 16-CR-68-PCR Wyatt Burk, Judge**
_____

**No. M2019-02037-CCA-R3-PC**
_____

The petitioner, Elvis Louis Marsh, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel at trial. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Jonathon Fagan, Nashville, Tennessee, for the appellant, Elvis Louis Marsh.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Robert J. Carter, District Attorney General; and William Bottoms, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Trial Proceedings*

The petitioner, Elvis Louis March, was convicted by a Marshall County jury of the sale of less than 0.5 grams of methamphetamine; conspiracy to sell or deliver less than 0.5 grams of methamphetamine; possession of 0.5 grams or more of methamphetamine with the intent to sell or deliver; and possession of drug paraphernalia, for which he received an effective sentence of thirty years to be served in confinement. On direct appeal, this Court summarized the facts surrounding the petitioner's convictions as follows:

> The [petitioner's] convictions were the result of a controlled drug transaction and a subsequent search which uncovered drugs and drug paraphernalia. The Seventeenth Judicial District Drug Task Force ("Task

Force") utilized a confidential informant, Ms. Tara Rowe, to arrange a controlled buy from the co-defendant, Ms. Crystal Alexander. Ms. Rowe contacted Lieutenant Timothy Miller, then Assistant Director of the Task Force, and informed him that she believed she could purchase methamphetamine from Ms. Alexander. On September 30, 2015, Ms. Rowe sent a series of text messages to Ms. Alexander and made arrangements to purchase crystal methamphetamine. They agreed that Ms. Rowe would go to Ms. Alexander's house to pick up the methamphetamine that afternoon. Detective Jose Ramirez, an investigator for the Task Force, drove Ms. Rowe to Ms. Alexander's house that day. Detective Ramirez posed as Ms. Rowe's "sugar daddy." This transaction was the first time that Detective Ramirez worked with Ms. Rowe. Detective Ramirez placed a recording device on Ms. Rowe prior to her entering Ms. Alexander's house. The recording device could not transmit the recordings instantaneously.

Detective Ramirez waited in the car while Ms. Rowe was inside Ms. Alexander's house. While Ms. Rowe was in the house, Detective Ramirez was in contact with other members of the Task Force, including Lieutenant Miller and Director Timothy Lane.

Ms. Rowe testified that upon entering Ms. Alexander's house, she saw the [petitioner] sitting on the couch in the living room with methamphetamine and scales on the couch beside him. Ms. Alexander, her father, and four children were also at the house. Ms. Rowe testified that the transaction took place between her and the [petitioner] in the living room. Ms. Rowe said she paid the [petitioner] one hundred dollars, using bills with recorded serial numbers. She testified that the [petitioner] weighed the methamphetamine on the scales during the transaction and that she retrieved it from the couch.

At trial, the State played a recording of the transaction. On the recording, Ms. Rowe talked to the [petitioner], Ms. Alexander, and Ms. Alexander's father. Ms. Rowe and Ms. Alexander discussed selling a couch at the beginning of the transaction. Ms. Rowe talked about someone having their own scales there. Ms. Rowe and one of the males on the tape, either the [petitioner] or Ms. Alexander's father, discussed trying to find "nerve pills." Ms. Alexander told Ms. Rowe that she "put another bag around it because the other bag is real thin and you don't want to lose it." Ms. Rowe then engaged in small talk about selling a sound system. Ms. Rowe told the [petitioner] that she had access to other drugs that she could pick up from the pharmacy that afternoon and that if he was interested, Ms. Alexander had her

number and he could call her. As Ms. Rowe was leaving she asked, "Are we good?" and the [petitioner] replied "yeah."

After the transaction was completed, Ms. Rowe immediately got back into Detective Ramirez's car, where she gave him a clear plastic bag that contained the methamphetamine she had just purchased. After they drove to a predetermined meeting location, Detective Ramirez weighed the methamphetamine, which weighed less than the one gram that Ms. Rowe thought she had purchased. At the direction of the drug task force agents, Ms. Rowe called Ms. Alexander's cell phone to let her know that the methamphetamine was less than a gram. The State played recordings of three phone calls made by Ms. Rowe to Ms. Alexander's cell phone. The [petitioner] answered the cell phone each time. During the first call, Ms. Rowe told the [petitioner] that she weighed the drugs on her scales and that it only weighed 0.6 grams. She told him that he should check his scales. Conversation during the second call was again focused on the [petitioner] needing to check his scales because Ms. Rowe did not receive a full gram of drugs. During the final call, Ms. Rowe and the [petitioner] again discussed the scales, and Ms. Rowe said that she "deals with" Ms. Alexander and not with him. At 3:08 p.m., Ms. Rowe sent a text message to Ms. Alexander's cell phone stating "[I']m stoned now." Ms. Rowe reiterated that she wished to conduct future transactions with Ms. Alexander in a text message sent at 3:11 p.m. which stated, "And id rather deal with her not u cuz u always trying to get over on me."

On cross-examination, trial counsel spent a great deal of time impeaching Ms. Rowe's ability to recollect information as well as her character for truthfulness. Ms. Rowe admitted she did not remember things "because I do a lot of drugs." She testified that she had seizures and bipolar disorder and overdosed twice in 2017. She said that at no point was she patted down by a female officer prior to or after making the controlled buy. Each member of the Task Force who testified agreed that on the day of the controlled buy, Ms. Rowe was lucid and did not appear to be under the influence of any narcotics or alcohol.

The members of the Task Force who testified each described the protocol used in controlled buys. Detective Ramirez testified that he prerecorded the bills by taking a photograph of the serial numbers on each bill and that he searched Ms. Rowe both before and after she entered Ms. Alexander's house. He admitted that he did not do a cavity search of Ms.

Rowe before or after the controlled buy and that there were no female officers present to conduct the cavity search.

After the controlled buy, Lieutenant Miller applied for a search warrant. The Task Force returned to Ms. Alexander's house several hours later with the search warrant. The [petitioner], Ms. Alexander, Ms. Alexander's father, and four children were present when the house was searched. Lieutenant Miller testified that Ms. Alexander was in the master bedroom during the search. The Task Force found 1.18 grams of methamphetamine, $807 in cash, pipes used to smoke methamphetamine, a small amount of marijuana, and unknown crushed pills in two Crown Royal bags in the master bedroom. Four of the prerecorded $20 bills used by Ms. Rowe in the earlier transaction were found on the bed, and one was found on the floor of the bedroom. The only contraband found outside the master bedroom was a set of electronic scales found on the couch in the living room.

Lieutenant Miller testified that after the search, he spoke with the [petitioner] and Ms. Alexander about where they purchased the methamphetamine. According to Lieutenant Miller, the [petitioner] and Ms. Alexander would meet a man named Jeff to purchase approximately three-and-a-half grams of methamphetamine multiple times a week. Lieutenant Miller claimed that both the [petitioner] and Ms. Alexander "admitted that they had about five or 10 regular customers that came to them. That Crystal sold to some of them, and [the petitioner] sold to some of them[.]" Director Lane testified that in Ms. Alexander's statement she stated that "on the majority of the sales, that [the petitioner] would be the person that would actually make the sale happen."

Special Agent Cassandra Franklin-Beavers with the Tennessee Bureau of Investigation ("TBI") testified that the substances seized from Ms. Alexander's house tested positive for methamphetamine. She testified that the methamphetamine purchased by Ms. Rowe weighed 0.34 grams and that the methamphetamine found in Ms. Alexander's master bedroom weighed 1.18 grams.

Ms. Alexander testified on behalf of the [petitioner]. The [petitioner] is the father of Ms. Alexander's two children. She said the [petitioner] would come to her house three times a week to care for their children while she was at work. Ms. Alexander testified that on September 30, 2015, Ms. Rowe came to her house to purchase methamphetamine. The transaction took place in Ms. Alexander's living room. She claimed that after Ms. Rowe paid the

[petitioner], he gave Ms. Alexander the money. Ms. Alexander then placed the money into a Crown Royal bag.

When officers returned a few hours later, Ms. Alexander was in her bedroom. She testified that the methamphetamine, marijuana, money, and pipes found during the search of the bedroom belonged to her. After law enforcement searched Ms. Alexander's house, she gave a statement to the officers. She admitted to law enforcement that she and the [petitioner] sold methamphetamine together approximately ten times per week. On cross-examination, Ms. Alexander admitted that the [petitioner] had been in the master bedroom earlier that day.

The jury found the [petitioner] guilty of the sale of less than 0.5 grams of methamphetamine, delivery of less than 0.5 grams of methamphetamine, conspiracy to sell or deliver less than 0.5 grams of methamphetamine; possession of 0.5 grams or more of methamphetamine with the intent to sell or deliver; and possession of drug paraphernalia. The trial court merged the sale, delivery, and conspiracy convictions and imposed an effective sentence of thirty years to be served in confinement. The [petitioner] filed a motion for a new trial arguing that the evidence presented at trial was insufficient to sustain each of his convictions. The trial court denied the motion, finding that, "[t]he evidence was not only sufficient, but frankly pretty overwhelming, when taken as a whole."

*State v. Elvis Louis Marsh*, No. M2017-02360-CCA-R3-CD, at *1-3 (Tenn. Crim. App. Feb. 1, 2019), *perm. app. denied* (Tenn. May 20, 2019).

This Court affirmed the trial court's judgments and the petitioner's thirty-year sentence.

### Post-Conviction Proceedings

Following his direct appeal, the petitioner filed a timely pro se petition for post-conviction relief. After the appointment of counsel, the petitioner filed an amended petition, arguing trial counsel was ineffective for: failing to have the bags of drugs found at the scene tested for DNA and fingerprints; failing to "follow through" on a motion in limine seeking to exclude the audio recordings made during and immediately after the controlled drug purchase; failing to inform the petitioner that only his felonies over the past ten years could be used against him for impeachment purposes; and for failing to raise, as a separate issue on appeal, the exclusion of Ms. Alexander's letter. The petitioner also

argued the cumulative effect of trial counsel's actions denied the petitioner of his Sixth Amendment right to effective assistance of counsel.

Both the petitioner and trial counsel testified at the post-conviction hearing. Trial counsel testified he represented the petitioner at trial and on appeal. Prior to trial, the State provided trial counsel with notice of its intent to use the petitioner's prior robbery and aggravated burglary felony convictions for impeachment purposes. In advising the petitioner about whether or not he should testify, trial counsel and the petitioner discussed the petitioner's extensive criminal history and how his prior felonies could negatively impact his testimony and credibility at trial. The petitioner then decided not to testify.

At trial, the two bags of methamphetamine found in Ms. Alexander's bedroom were introduced into evidence. Trial counsel did not have the bags tested for the petitioner's fingerprints or DNA, nor did he have an investigator inspect the evidence. Trial counsel testified that over the course of his nine-year career, he had never had drugs or drug containers tested for DNA or fingerprint evidence. In the petitioner's case specifically, trial counsel believed DNA and fingerprint testing would have been futile because several people could have come in contact with the bags at issue. Trial counsel further explained that regardless of whether fingerprints or DNA were found on the bags, the evidence would not have exonerated the petitioner as the State's theory was based on constructive possession.

Two audio recordings were also presented at trial. One recording, taken during the controlled drug buy, contained conversations between the confidential informant, Tara Rowe, and Ms. Alexander. The other recording was made by the Seventeenth Judicial District Drug Task Force ("Task Force"). The Task Force's preamble and postamble are generally excluded from evidence as a matter of course in Marshall County. Yet, trial counsel filed a motion in limine to ensure the exclusion of the preamble and postamble. The motion was granted and, without the objection of trial counsel, the recordings were authenticated and admitted into evidence at trial. Trial counsel explained that his failure to object to the admission of the recordings was part of his trial strategy because Ms. Rowe sounded intoxicated on the recordings. Hoping to attack Ms. Rowe's credibility, trial counsel attempted to use the recordings to show Ms. Rowe was a drug user and under the influence of drugs at the time the controlled buy took place.

Another piece of evidence at issue during trial was a letter written by Ms. Alexander. In the letter, Ms. Alexander took responsibility for possessing the methamphetamine found in her home and claimed none of the drugs or paraphernalia belonged to the petitioner. After Ms. Alexander testified to the contents of the letter, trial counsel moved to have the letter admitted into evidence. The trial court denied the request. While preserved in his

motion for new trial, the petitioner failed to raise the issue as a stand-alone claim on appeal; however, trial counsel did discuss the issue in the body of his appellate brief.

Next, the petitioner testified about the conversations he and trial counsel had prior to trial. While trial counsel explained that the petitioner's extensive criminal history could be used to impeach his credibility and that it may not be in the petitioner's best interest to testify given his career offender status, trial counsel did not explain that only the petitioner's convictions occurring within the past ten years could be used for impeachment purposes. The petitioner stated he would have testified had trial counsel explained that only his felony convictions for robbery and aggravated burglary could be used against him. While acknowledging robbery and burglary are crimes of dishonesty, the petitioner believed it should have been up to the jury to determine whether he was truly dishonest. The petitioner admitted, however, that trial counsel told him it was the petitioner's decision whether or not to testify.

On cross-examination, the petitioner testified that he sent trial counsel letters praising trial counsel's work in preparing for the petitioner's case and for trial counsel's work during trial. The petitioner explained, however, it was not until after he sent the letters that he realized the mistakes trial counsel had made. The petitioner presented no other evidence at the post-conviction hearing.

After reviewing the proof, the post-conviction court denied the petition. This timely appeal followed.

### *Analysis*

On appeal, the petitioner argues trial counsel was ineffective for failing to have the bags of drugs found at the crime scene tested for DNA and fingerprints; for failing to raise, as a separate issue on appeal, the trial court's exclusion of Ms. Alexander's letter; and that the above failures cumulatively resulted in a violation of the petitioner's Sixth Amendment right to the effective assistance of counsel. The State argues the petitioner failed to establish that trial counsel was ineffective in any regard and, as such, cannot prove cumulative error. Following our review of the record and the submissions of the parties, we affirm the judgment of the post-conviction court.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial

court's application of the law to the facts is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations de novo, affording a presumption of correctness only to the post-conviction court's findings of fact. *See id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the Strickland test must be satisfied. *Id*. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the Strickland test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## A. Failure to Investigate Physical Evidence

The petitioner argues trial counsel was ineffective for failing to have the bags which contained the drugs tested for DNA and fingerprint evidence. Specifically, the petitioner contends the test results "could have exonerated [the p]etitioner as to the actual possession of the drugs at issue," and that such proof could have undermined the State's case-in-chief in the minds of the jury. The petitioner concedes that while DNA and fingerprint evidence could potentially disprove actual possession, they would not refute the State's theory of constructive possession. The State contends the petitioner failed to establish he was prejudiced by trial counsel's decision not to test the bags. Upon our review of the record, we affirm the judgment of the post-conviction court.

The post-conviction court made the following findings regarding this issue:

> The evidence presented at trial established that the [petitioner] was not merely present in Ms. Alexander's house. Although the methamphetamine weighing over 0.5 grams was found in Ms. Alexander's bedroom, the [petitioner] had access to the bedroom, and Ms. Alexander acknowledged that the [petitioner] had been in her bedroom on the day of the offenses. Further, the jury could infer that the [petitioner] had the ability to exercise control over the contraband found in Ms. Alexander's bedroom based on the transaction with Ms. Rowe that took place mere hours earlier in which he had possession of the methamphetamine, placed an amount of it onto his scales, weighed it, and accepted Ms. Rowe's money in exchange for it. Although Ms. Alexander testified that the methamphetamine found in the bedroom belonged to her and not the [petitioner], the jury was not obligated to accept her testimony. However, Ms. Alexander also gave a statement that she and the [petitioner] regularly participated in drug transactions.
> . . .
> The testing of the 'baggie' for fingerprints or DNA would have likely yielded no conclusive results, and certainly even if the results yielded fingerprints or DNA inconsistent with that of the [petitioner's], there is overwhelming evidence to prove that the [petitioner] had constructive possession of the 'drugs in question.'

At the post-conviction hearing, trial counsel testified that throughout his nine-year practice he never tested drug evidence for DNA or fingerprints. He further explained there was no need to have the bags tested because the State was relying on and arguing constructive, not actual, possession. The post-conviction court accredited the testimony of

trial counsel, and nothing in the record preponderates against the findings of the post-conviction court. *See Tidwell*, 922 S.W.2d at 500. Additionally, the petitioner did not present any evidence that trial counsel's failure to have the bags tested was objectively unreasonable, and stipulated DNA and fingerprint evidence would not disprove the State's theory of constructive possession. *See Goad*, 938 S.W.2d at 369. We also note the petitioner did not present the results of any such testing at the post-conviction hearing. *See Black v. State*, 749 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Based on our review of the record, the petitioner failed to meet the burden required of him. *Strickland*, 466 U.S. at 694. Accordingly, the petitioner is not entitled to relief on this issue.

## B. Failure to Raise Issue on Appeal

Next, the petitioner argues trial counsel was ineffective for failing to raise, as a separate issue on appeal, that the trial court erred in denying the admission of Ms. Alexander's letter into evidence. Specifically, the petitioner asserts trial counsel's error waived the issue on appeal to the Tennessee Supreme Court. The State argues trial counsel successfully raised the issue on appeal, and the petitioner failed to establish trial counsel's performance was deficient or that the petitioner was prejudiced as a result of counsel's performance. Upon our review of the record, we agree with the State.

Appellate counsel is not constitutionally required to raise every conceivable issue on appeal. *King v. State*, 989 S.W.2dd 319, 334 (Tenn. 1999). The determination of which issues to raise on appeal is within appellate counsel's sound discretion, and appellate counsel's professional judgment should be given considerable deference. *Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004) (citing *Jones v. Barnes*, 463 U.S. 745, 751 (1983)); *see also Strickland*, 466 U.S. at 689.

If a claim of ineffective assistance of counsel is based on the failure to raise a particular issue on appeal, then the reviewing court must determine the merits of the issue. *Id*.; *see also Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). If an issue is weak or without merit, then appellate counsel's performance will not be deficient if counsel fails to raise it. *Id*. "Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal." *Id*. The petitioner cannot prevail on an ineffective assistance of counsel claim when an omitted issue is without merit. *Id*. at 888. With regard to the merits of this issue, the post-conviction court made the following findings:

> [T]he [petitioner] called Ms. Alexander during its case-in-chief. The contents of the letter were read by Ms. Alexander and she, in fact, orally testified consistent with the letter. The jury was able to hear the testimony

of Ms. Alexander directly, and in the Court's post-trial view, the letter became a prior consistent statement. [Ms. Alexander] testified that the methamphetamine, marijuana, money, and pipes found during the search of the bedroom belonged to her. Any "failure" to gain admittance of the letter was of no consequence. This issue was preserved for appeal and was presented to the Tennessee Court of Criminal Appeals within the body of the [petitioner's] brief. This Court holds that the result would have been the same with or without the letter being admitted as substantive evidence. This issue is simply without merit.

Here, trial counsel attempted to have Ms. Alexander's letter admitted into evidence at trial. This request was denied by the trial court. The denial was then argued by trial counsel in a motion for new trial and preserved for appeal within the petitioner's brief. Moreover, the petitioner called Ms. Alexander to testify during his case-in-chief. During her testimony, the contents of the letter were read by Ms. Alexander, and she, in fact, testified consistent with the letter. Thus, the jury was able to hear Ms. Alexander's testimony directly. The post-conviction court found that any failure to admit the letter was of no consequence because the result would have been the same with or without the letter as substantive evidence. As a result, the post-conviction court found the petitioner's argument to be without merit. Even if trial counsel had raised the exclusion of the letter as a separate issue on appeal, the petitioner has failed to show he would have been granted relief. Accordingly, the petitioner has not established prejudice, and is not entitled to relief.

## C. Cumulative Error

Finally, the petitioner contends the cumulative effect of the errors alleged above entitle him to a new trial. "To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010). Because the petitioner has not established any error, he is not entitled to relief under the cumulative error doctrine.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE